Filed 4/3/26  P. v. Boyd CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRIAN THOMAS BOYD,<br><br>    Defendant and Appellant. | D084975<br><br><br>(Super. Ct. No. SCN437755) |


APPEAL from a judgment of the Superior Court of San Diego County, Sim von Kalinowski, Judge.  Affirmed.

Patrick M. Ford for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Flavio Nominati, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

A jury convicted defendant Brian Thomas Boyd of receiving stolen construction vehicles (Pen. Code,[1] § 496d, subd. (a)), being a felon in possession of a firearm (§ 29800, subd. (a)(1)) and ammunition (§ 30305, subd. (a)(1)), and grand theft of personal property and a firearm (§ 487, subds. (a), (d)(2)). The trial court sentenced defendant to seven years in prison. Defendant raises two issues on appeal.

First, defendant contends his trial counsel provided ineffective assistance because he operated under a conflict of interest caused by representation of defendant in this case while also representing defendant's brother Devin Boyd (Brother) in unrelated misdemeanor criminal cases.[2] Defendant maintains this conflict prevented his trial counsel from adequately investigating the case and from presenting a third-party-culpability defense blaming Brother (who died about nine months before trial began). We are unpersuaded. As we will explain, defendant's trial counsel vigorously represented defendant at all stages of the case, including by mounting a third-party-culpability defense that expressly blamed Brother.

Second, defendant contends the trial court erred at sentencing by determining the principal term of his sentence using an elevated alternative sentencing scheme for recidivist auto thieves. (See § 666.5, subd. (a).) Defendant argues this violated a provision in the state constitution that precludes the use of an "alternative sentence" when determining the "full

---

[1]    Further statutory references are to the Penal Code unless otherwise indicated.

[2]    Defendant also filed a related petition for writ of habeas corpus (*In re Brian Thomas Boyd*, D085808) claiming ineffective assistance of counsel. That petition was ordered to be considered with this appeal. We deny that petition by separate order.

term for the primary offense." (Cal. Const., art. I, § 32, subd. (a)(1)(A).) We disagree. As we will explain, the cited constitutional provision relates to determining eligibility for parole consideration; it does not govern trial court sentencing.

Accordingly, we affirm the judgment.

## II. BACKGROUND

### A. Factual Background

Defendant's convictions stem from three separate incidents: (1) the November 2021 theft of an excavator from a construction site in Hillcrest; (2) the January 2022 theft of a firearm and personal property from a vehicle; and (3) the July 2022 theft of a trailer-mounted water tank from a construction site in Carlsbad.

#### 1. November 2021 Excavator Theft

On November 16, 2021, an employee of an equipment rental company reported to the San Diego Police Department that a Caterpillar 305 excavator owned by the company had been stolen from a construction site in Hillcrest.

#### 2. January 2022 Firearm and Personal Property Theft

Kelsie G. was defendant's former roommate at his residence on Wrightwood Road in Bonsall (the Property). Kelsie lived in an upstairs bedroom and defendant lived in a downstairs bedroom. Kelsie moved out in late December 2021 or early January 2022 after she began dating Steven C. Kelsie had previously rebuffed defendant's romantic overtures and defendant expressed to Kelsie and Steven that he did not approve of their relationship. Kelsie and defendant's roommate situation ended on a "bad note."

3

On January 24, 2022, Kelsie and Steven were babysitting at a friend's apartment in Fallbrook. Steven parked his SUV in the friend's designated parking space. When Steven later went to get something from his SUV, he discovered it had been rummaged through and several items were stolen. Steven's stolen property included (1) a two-tone Springfield Armory handgun with two loaded magazines; (2) a Makita tool bag with power tools; and (3) two jackets. Kelsie's purse was also taken. Steven called 911 and reported the theft to the sheriff's department.

### 3. July 2022 Water Tank Theft

On July 18, 2022, a 1,000-gallon "Arizona Waterdog" trailer-mounted water tank (the waterdog) owned by Sierra Landscape Development (Sierra) was discovered missing from a construction site along Interstate 5 in Carlsbad. The company's president tracked the waterdog using a GPS device mounted to the trailer. The GPS data's "breadcrumbs" showed that the waterdog was at the construction site on the morning of July 17, 2022, was traveling along Highway 76 in Oceanside a few hours later, and "pinged" at the Property around 2:00 p.m. the same day.

Sierra's president sent a company project manager to the Property to look for the waterdog. The project manager arrived around 8:40 a.m. on July 18, 2022. He took a photo of the Property and sent it to the president. The president saw the waterdog in the photo and noticed that stickers bearing the company's logo had been removed, leaving discolored silhouettes where the stickers had been. The project manager reported the waterdog theft to the California Highway Patrol (CHP).

### 4. The Investigation

On the evening of July 18, 2022, CHP executed a search warrant for the Property. The walled-in Property was in a rural area and had many vehicles and pieces of equipment on it. Defendant was home alone, made himself known, and was detained during the search. A records check revealed that he was a convicted felon and was prohibited from possessing firearms.

On the Property, officers found and seized two excavators: a Caterpillar 305 and a Caterpillar 279. Investigators determined the Caterpillar 305 was the one reported stolen from the Hillcrest construction site in 2021. The other excavator belonged to defendant and was returned to him. CHP officers did not find the waterdog on the Property.

Inside defendant's residence at the Property, officers found a loaded Glock 22 handgun and ammunition. This gun was found between layers of folded male clothes on a nightstand in the downstairs bedroom.

Inside a recreational vehicle (RV) on the Property, officers found a loaded Glock 48 handgun and ammunition. In a cabinet inside the RV, officers found a two-tone Springfield Armory handgun. A records check showed this gun had been reported stolen.

At the end of the search, CHP officers arrested defendant for being a felon in possession of a firearm.

The next day (July 19, 2022), Sierra personnel found the stolen waterdog. GPS data showed it had been on Via Margarita in Bonsall around 2:06 p.m. on July 18 and on Rolling Hills Drive in Valley Center around 5:48 a.m. on July 19. The Sierra project manager traveled to the Via Margarita location and found a battery that powered the waterdog's electric brake system. He then traveled to the Valley Center location, where he

5

found the waterdog. Its Sierra logo stickers had been removed. The project manager recognized the waterdog as being the equipment he had photographed on the Property the morning before. He reported his discovery to CHP.

A few months later, in September 2022, defendant's girlfriend J.B. (Girlfriend) contacted Kelsie and returned her stolen purse. Girlfriend testified at trial that CHP officers had given her Kelsie's purse when they found it while searching the Property. Based on the recovery of her stolen purse, Kelsie followed up with sheriff's investigators regarding the January 2022 theft from Steven's SUV. Investigators had previously obtained security footage from the apartment complex where the theft occurred. One video clip showed a man walking into the complex at 11:15 p.m. and another clip showed him leaving the complex at 11:22 p.m. A sheriff's detective showed Kelsie and Steven still images from the surveillance footage. With "100 percent" certainty, they both identified defendant as the man depicted in the photos. Steven also saw that the man was carrying one of Steven's stolen jackets and the stolen Makita tool bag.

### 5. Defense Evidence

As we discuss in greater detail below (see part III.A.2, *post*), defendant presented an alibi defense to the charges stemming from the waterdog theft and the theft from Steven's SUV. The defense also raised a third-party-culpability defense, blaming Brother for all the crimes.

## B. Procedural History

As relevant here, the People charged defendant with one count of possession of a firearm by a felon (§ 29800, subd. (a)(1));[3] one count of possession of ammunition by a felon (§ 30305, subd. (a)(1)); two counts of receiving a stolen vehicle (§ 496d, subd. (a)) — one as to the waterdog and one as to the Caterpillar 305 excavator; one count of grand theft of a firearm (§ 487, subd. (d)(2)); and one count of grand theft of personal property (§ 487, subd. (a)). The People also alleged that defendant had prior felony convictions for: (1) robbery in 2009 (§ 211), which constituted both a serious felony prior (§ 667, subd. (a)(1)) and a strike prior (§ 667, subds. (b)–(i)); and (2) auto theft (Veh. Code, § 10851, subd. (a)) and receiving a stolen vehicle (§ 496d, subd. (a)), both of which made defendant eligible for longer sentences on his current charges of receiving a stolen vehicle. (See § 666.5, subd. (a) ["Every person who, having been previously convicted of a felony violation of Section 10851 of the Vehicle Code . . . or a felony violation of Section 496d . . . , is subsequently convicted of these offenses shall be punished by imprisonment . . . for two, three, or four years," instead of for 16 months, two years, or three years].)

After deliberating for less than two hours, the jury returned guilty verdicts on all counts at issue here. Defendant waived his right to a jury trial on the prior conviction allegations and admitted them.

At sentencing, the trial court struck defendant's prior strike conviction and sentenced him to an aggregate term of seven years in prison. The sentence consisted of (1) the principal term of four years for receiving the

---

[3]     This count was based on defendant's alleged possession of the Glock 22, the Glock 48, *or* the Springfield Armory handgun. The jury was instructed that it had to unanimously agree which firearm(s) defendant possessed.

stolen waterdog (the upper term of the § 666.5 elevated sentencing triad); (2) a consecutive one-year term for receiving the stolen excavator (one-third of the upper term of the 16-month/two-year/three-year sentencing triad under § 496d, subd. (a)); and (3) three consecutive eight-month terms (one-third of the middle term of the generally applicable 16-month/two-year/three-year sentencing triad under § 1170, subd. (h)(1)) for each of the firearm-possession, ammunition-possession, and firearm-theft charges.  The court imposed, but stayed under section 654, a three-year upper term sentence on the personal property-theft charge.

At a November 1, 2024 resentencing hearing, the trial court rejected defendant's contention that the court erred by designating the four-year sentence for receiving the stolen waterdog as the principal term.  We discuss this issue in part III.B, *post*.

## III.  DISCUSSION

### A.  Defendant Has Not Shown That He Received Ineffective Assistance of Counsel

Defendant contends he received ineffective assistance of counsel because his trial counsel was laboring under a conflict of interest by virtue of simultaneously representing defendant in this case while also representing Brother in other unrelated criminal cases.  We disagree.

#### 1.  Relevant Legal Principles

"A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution.  This constitutional right includes the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his or her client."  (*People v.*

8

*Doolin* (2009) 45 Cal.4th 390, 417 (*Doolin*); see *People v. Woodruff* (2018) 5 Cal.5th 697, 739 (*Woodruff*).) " 'Conflicts of interest broadly embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client . . . .' [Citation.] 'Conflicts may also arise in situations in which an attorney represents a defendant in a criminal matter and currently has or formerly had an attorney-client relationship with a person who is a witness in that matter.' " (*Woodruff*, at p. 739.)

"[C]laims of Sixth Amendment violation based on conflicts of interest are a category of ineffective assistance of counsel claims that, under [*Strickland v. Washington* (1984) 466 U.S. 668], generally require a defendant to show (1) counsel's deficient performance, and (2) a reasonable probability that, absent counsel's deficiencies, the result of the proceeding would have been different." (*Doolin*, *supra*, 45 Cal.4th at p. 417; see *Woodruff*, *supra*, 5 Cal.5th at p. 739.) "In the context of a conflict of interest claim, deficient performance is demonstrated by a showing that defense counsel labored under an actual conflict of interest 'that affected counsel's performance—as opposed to a mere theoretical division of loyalties.' [Citations.] '[I]nquiry into actual conflict [does not require] something separate and apart from adverse effect.' " (*Doolin*, at pp. 417–418, italics omitted.)

" 'Determining "whether counsel's performance was 'adversely affected' . . . 'requires an inquiry into whether counsel "pulled his punches," i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict. [Citation.] In undertaking such an inquiry, we are . . . bound by the record. But where a conflict of interest causes an attorney not to do something, the record may not reflect such an omission.

9

We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' " ' " (*Woodruff*, *supra*, 5 Cal.5th at p. 739.)

### 2. Background

To assist our determination of whether defendant's trial counsel " ' " ' "pulled his punches" ' " ' " (*Woodruff*, *supra*, 5 Cal.5th at p. 739), we describe counsel's efforts in great detail here.

### a. Trial Counsel's Representation of Defendant and Brother

Defendant was first arraigned in this case on November 30, 2022. Attorney David Demergian represented defendant from the arraignment until sentencing.

The appellate record in this case shows that Demergian also represented Brother in unrelated criminal cases, including at misdemeanor sentencing hearings in January 2020 and July 2023, and at a probation revocation hearing in July 2023.

Brother died on August 21, 2023.

### b. Trial Counsel's Pretrial Representation of Defendant

### (i) Preliminary Hearing

Defendant's preliminary hearing was held on June 22, 2023, about two months before Brother's death. The prosecutor established that defendant's cellphone records showed he was near the scene of the Carlsbad waterdog theft site around the time of the theft; that the excavator stolen from the

10

Hillcrest construction site was found on the Property; that Steven's stolen gun was found in the RV on the Property; and that Kelsie identified defendant in photos taken from the surveillance footage of the apartment complex.

During the prosecutor's direct examination of its witnesses, Demergian made many evidentiary objections, some of which were sustained.

Demergian also thoroughly cross-examined the prosecution witnesses. Sierra's project manager acknowledged he had limited visibility into the Property and that he was not aware whether the company's GPS equipment was ever calibrated. One of the CHP officers who executed the search warrant at the Property stated that defendant lived in the residence and it appeared that someone lived in the RV. Kelsie acknowledged that other people stayed at the Property "for days or weeks at a time," and that defendant's face was not visible in the security camera photo used as a preliminary hearing exhibit. Finally, a sheriff's deputy involved in the investigation of the theft from Steven's SUV testified that an eyewitness identified a possible perpetrator who looked different than defendant and that the deputy "would not be able to confidently say that" defendant was the person in the security camera photo.

Despite Demergian's efforts, the trial court held defendant to answer on all charges.

### (ii) Demurrer

On August 24, 2023, Demergian filed a demurrer to the information, raising two arguments. First, he argued the firearm- and ammunition-possession charges were barred by the Second Amendment as recently interpreted by the United States Supreme Court and a federal appellate

11

court.  The demurrer acknowledged contrary California case law.  The trial court overruled the demurrer as to this ground.[4]

The second ground for Demergian's demurrer was the People's alleged failure to timely file the amended information.  The trial court stated it had been inclined to sustain the demurrer on this ground but concluded it had become unnecessary to do so because the parties agreed that defendant would be arraigned on a new consolidated charging document.

### (iii)  Suppression of GPS Evidence

On December 22, 2024, Demergian filed a motion to quash the warrant on which the search of the Property was based and to suppress the fruits of that search.  Counsel argued there was no probable cause because, although the waterdog's GPS pinged near the Property, a CHP officer and a "flyover" were unable to visually confirm the waterdog's presence on the Property.  Counsel also argued the warrant was overbroad because it authorized searches of areas in which the waterdog could not have been located (e.g., inside defendant's residence and the RV).

At the suppression hearing, Demergian questioned Sierra's president and presented subpoenaed records regarding the GPS tracking system.

The trial court denied the defense motion.

### (iv)  Motions in Limine

Demergian filed 25 motions in limine on defendants' behalf.  Although many were routine (e.g., to exclude evidence not disclosed during discovery), three are notable.  First, Demergian sought "to preclude testimony relative to GPS readings" or to hold an Evidence Code section 402 hearing to establish

---

[4]    Demergian later advised the court of additional recent federal appellate authority that supported the defense position.

the reliability of the GPS evidence.  The court held the requested evidentiary hearing, at which Demergian again questioned Sierra's president about the reliability of the GPS readings.  The trial court denied the motion in limine but allowed counsel to ask foundational questions about the GPS data at trial.

The second notable motion in limine sought to preclude Kelsie and Steven from identifying defendant in the photos from the apartment complex surveillance footage.  Demergian argued that allowing them to do so would invade the jury's province.  The trial court denied this motion, subject to the prosecutor laying a foundation for the witnesses' identification testimony.

Finally, Demergian sought to exclude references to the Caterpillar 305 excavator stolen from the Hillcrest construction site.  Counsel argued that after CHP seized the excavator during the search of the Property, CHP returned the excavator to its owner without first notifying the defense, in supposed violation of Vehicle Code section 6171.[5]  At the motion hearing, the prosecutor advised that the excavator was still in CHP custody.  Demergian responded, "If it's still in . . . CHP custody, then I'd like to see it."  The trial court denied the request to exclude all evidence of the excavator, but directed the prosecutor to confirm its whereabouts, leaving open the possibility that

---

[5]    Vehicle Code 6171 states:  "When criminal charges have been filed involving a motor vehicle alleged to have been stolen and the vehicle is in the custody of a peace officer for evidentiary purposes, it shall be held in custody or, if a request for its release from custody is made, until the prosecutor has notified the defendant or his or her attorney of that request and both the prosecution and defense have been afforded a reasonable opportunity for an examination of the motor vehicle to determine its true value and to produce or reproduce, by photographs or other identifying techniques, legally sufficient evidence for introduction at trial or other criminal proceedings."

13

the court might instruct the jury about a possible improper release of the excavator.

The prosecutor later confirmed that the excavator had been returned to its owner on July 19, 2022. Demergian requested that the court instruct the jury that the notice ostensibly required by Vehicle Code section 6171 "was [not] given [to defendant] or his attorney in this case" and that the jury "may consider that fact in [its] deliberations." The trial court denied the defense request, finding the statute inapplicable because the excavator was returned before charges were filed against defendant and the statute applies only "[w]hen criminal charges have been filed." (Veh. Code, § 6171.)

### c. Trial Counsel's Trial and Witness Strategy

Demergian pursued alibi and third-party-culpability defenses, suggesting Brother committed the charged offenses.

Through cross-examination during the People's case in chief, Demergian intimated that other people lived at Property and therefore had access to the stolen property. For example, Kelsie acknowledged that "one of [defendant]'s coworkers lived in [a] trailer on the Property." Demergian asked one of the CHP witnesses whether (1) she was aware that defendant had a brother who was a trustee of the trust that owned the Property, and (2) clothing found in the RV was defendant's or Brother's size. The officer did not know the answers to these questions. Demergian also questioned another CHP officer about his knowledge of Brother and whether Brother lived at the Property.

Demergian also presented several defense witnesses. We will first describe the circuitous route by which Demergian disclosed them; we will then summarize their testimony.

14

On May 24, 2024, less than a week before trial began on May 28, Demergian filed a list of potential defense witnesses. In a "preliminary statement," Demergian acknowledged he had "not fully completed his investigation of the facts relating to this case and ha[d] not completed his preparation for trial." The preliminary statement concluded with the following disclaimer:

> Defendant does not presently intend . . . to call any witnesses, or offer any evidence at the trial hereof. Rather, defendant presently intends to rely upon the presumption of innocence and put the people to their burden of proof beyond a reasonable doubt of the offense(s) charged. Based, however, upon the evidence adduced by the people, defendant may at any time elect, and reserves the right to elect, to call any and all witnesses, and introduce any and all evidence, which may be probative on an issue placed before the court or trier of fact by the people, at which time any statements and the like obtained from such witnesses will . . . be provided. (Bolding and capitalization omitted.)

Notwithstanding these disclaimers, Demergian listed nine witnesses that the defense "may, but does not presently intend, to call." The list included Girlfriend, Keith M., Frank H., and John H.

The court and counsel discussed witness scheduling before the prosecution began presenting its case. The prosecutor cited the defense's witness list and requested that the defense provide witness statements as soon as any are prepared. Demergian responded that he was "not playing a discovery game" and confirmed he had not "actually . . . spoken to any of" the potential witnesses yet but would "certainly provide counsel a statement" as soon as he "ma[d]e the call" to interview any witnesses.

Near the end of the People's case in chief, the prosecutor advised that the defense still had not provided any statements or other biographical

15

information for any defense witnesses. The prosecutor expressed concern that (1) the defense would not be prepared to present its case when the People rested, and (2) the prosecutor would need time to conduct due diligence regarding any defense witnesses. The prosecutor referenced a chambers conference during which Demergian indicated he would identify three witnesses so the prosecutor could begin preparing.

Demergian responded that he had "not yet formed an agenda to call any witnesses," but indicated he would be interviewing three witnesses that evening and "promised to provide [the prosecutor] with their names and addresses." Demergian also confirmed that if he "form[ed] an intent to call" any witnesses, he would "certainly let [the prosecutor] know immediately and provide any statements."

The court confirmed that, in chambers, Demergian had identified three potential witnesses and disclosed that he "need[ed] to talk to these witnesses face-to-face before" deciding whether to call them. The court stated that if the prosecution finished its case that day (Tuesday), the defense would begin its case on Thursday so that the court and counsel could work on jury instructions and verdict forms on Wednesday. The People rested their case that day (Tuesday, June 4, 2024).

The defense began presenting its case on Thursday, June 6. Demergian requested that the court take judicial notice of Brother's death certificate and of the fact that Brother had pleaded guilty to " 'having a vehicle on a public highway while impaired from alcohol and with a loaded firearm.' " Counsel argued the conviction was relevant because Girlfriend would likely testify that Brother showed her Steven's stolen gun and claimed it was his (Brother's), and Brother's conviction established his statement was admissible under the hearsay exception for statements against interest. The

16

prosecutor objected that, because Brother "is deceased, . . . the People have no opportunity to cross-examine him on this." The trial court took judicial notice of the death certificate and ruled that "the statement about the firearm can come in."

Before beginning the defense case, Demergian moved for acquittal under section 1118.1. The trial court denied the motion. Demergian gave an opening statement and called his first witness.

John H. testified he moved into a house across the street from the Property in June 2022 (the month before the search warrant execution). John testified that he had seen Brother at the Property but never saw defendant there before the search. John testified he first met Demergian in the courthouse hallway before testifying.

Keith M. testified he lived in a casita on the Property and "help[ed] out with some projects around the Property." Keith saw Brother at the Property "usually quite often" in the summer of 2022 and it appeared Brother was staying in the RV. Keith "rarely" saw defendant at the Property that summer. Keith saw Brother operate a Caterpillar 305 excavator at the Property but never saw defendant do so. Keith testified there was always a trailer-mounted water tank on the Property — even before the waterdog theft — and he never saw another one there. On January 24, 2022 (the night of the theft from Steven's SUV), Keith testified he was with defendant and Girlfriend celebrating her birthday from about 6:00 p.m. to 11:00 p.m. Turning to July 17, 2022 (the day the waterdog was likely stolen), Keith saw defendant come to the Property to get his boat. Regarding his preparation for trial, Keith testified he had spoken to Demergian "both socially, before this case, and thereafter," and that they had "met specifically about this case" two evenings earlier.

17

Frank H. testified that in July 2022 he lived in a travel trailer on the Property and did jobs for defendant. Frank stated that Brother lived in the RV on the Property. Frank "rarely" saw defendant at the Property in summer 2022. Frank saw Brother operate an excavator "that he had [come] to the Property with," but Frank never saw defendant operate it. Frank testified there was always a trailer-mounted water tank on the Property. He did not see the waterdog there on July 17 or 18 and said it "would surprise [him]" to learn that the waterdog's GPS pinged on the Property that day. On January 24, 2022, Frank celebrated Girlfriend's birthday with her and defendant "from early afternoon till later in the evening." Frank believed it was "not possible" that defendant could have been at the scene of the SUV break-in. On July 17, 2022, Frank saw defendant come to the Property to pick up a boat. Frank testified he had met Demergian "a number of times for purposes other than this case" and that they "met for the first time relative to this case the night before last."

Girlfriend was the final defense witness. She testified that Brother had the keys and access to the RV; defendant did not. Brother used the Property for construction staging and Girlfriend saw him operate a Caterpillar excavator there; she never saw defendant operate the excavator. Girlfriend only ever saw one water tank on the Property and never saw the waterdog there. Regarding the night of the theft from Steven's SUV, Girlfriend testified that defendant and Frank were celebrating her birthday with her and that she and defendant went to bed around 11:00 p.m. The person in the screenshots from the surveillance footage did not look like defendant. Girlfriend explained that CHP officers gave her a purse they found during the search of the Property, and she returned it to Kelsie. Regarding the waterdog theft, Girlfriend testified there was no way defendant could have

18

been at the Property when the waterdog's GPS pinged there because he had retrieved his boat from the Property and taken Girlfriend and her children out on the bay all day. Girlfriend claimed that Brother once showed her a two-toned handgun. She also claimed the Glock 22 recovered from the nightstand in the residence bedroom was hers, not defendant's. Regarding trial preparation, Girlfriend testified she and Demergian had "chatted socially before [they] ever talked about this case," which they first discussed two evenings earlier.

The parties stipulated that the waterdog, the Caterpillar 305 excavator, and the personal property stolen from Steven's SUV were each worth more than $950.

In his closing argument, Demergian addressed the presumption of innocence; the reasonable doubt standard; confirmation bias and investigatory "tunnel vision"; and circumstantial evidence. Turning to the evidence, Demergian emphasized the absence of fingerprint evidence tying defendant to the stolen property; the lack of visual evidence corroborating the waterdog GPS data; defendant's alibi defense; and Brother's access to the stolen property.

In her rebuttal argument, the prosecutor characterized the defense theory as follows: "There was always one of three lies or excuses: Blame it on the defendant's deceased brother . . . who can't testify for obvious reasons"; "blame it on his devoted girlfriend"; "or it was an alibi."

### d. Posttrial Proceedings

After the jury returned its guilty verdicts, Demergian asked the court to allow defendant to remain at liberty until sentencing. The prosecutor opposed the request. "Against [its] better judgment," the court granted

19

Demergian's request. The court told defendant, "Your attorney made a very good argument for you. Typically, I won't allow you to stay out."

### e. Replacement Counsel's New Trial Motion

### (i) The Motion

Before sentencing, defendant replaced Demergian with new trial counsel. Defendant's replacement counsel filed a motion for new trial on the basis that Demergian rendered "constitutionally inadequate representation." The motion argued Demergian performed deficiently in three ways.

First, the motion argued Demergian performed deficiently by failing to disclose and obtain a waiver of a conflict of interest that existed because of Demergian's concurrent representation of defendant and Brother "in separate criminal matters." The motion asserted "it wasn't until after trial that Defendant realized that the conflict had prevented him from being able to establish his main defense . . . that his brother was an alternative suspect because [Demergian] could not present such evidence without harming [Brother]."

Second, the motion argued Demergian "failed to adequately investigate the case." The motion cited (1) the preliminary statement to Demergian's witness list (i.e., that Demergian had " 'not fully completed his investigation of the facts relating to this case and has not completed preparation for trial' "); (2) Demergian's statements to the court while discussing witness scheduling (i.e., that he had not spoken to " 'any of them yet' "); and (3) Demergian's belated request during a motion hearing to view the excavator. The motion also faulted Demergian for failing to hire an investigator, who could have (1) "identified witnesses that could provide testimony to support Defendant's defense that his brother was staying in the RV and was engaging in criminal activity"; and (2) found "evidence of when

20

and how the mini-excavator and water trailers were stolen" and "Defendant's exact location during th[os]e times." As further evidence of Demergian's alleged professional shortcomings, the motion quoted his statements to the court during the motion in limine hearing (e.g., stating in the context of GPS evidence, "Well, there are lots of things that I could have done in this case that I may not have done for lots of different reasons . . . I didn't hire a GPS expert. Why? It's not relevant. I didn't do whatever. [¶] . . . [¶] I can just sit here and look stupid.").

Third, the motion argued Demergian "failed to interview witnesses" who could testify (1) that Brother "was living in the RV at the time of the police's search and was engaged in criminal activity at that time"; (2) that Brother "was on the . . . [P]roperty the morning before the police arrived to execute the search"; (c) that "Defendant had turned his life around"; and (4) to establish "Defendant's location during the key times." The motion also faulted Demergian for failing to hire "an expert to challenge the GPS and cell phone ping testimony" and for "never interview[ing] [Brother] regarding what he knew about the alleged thefts of property and handguns found in the house and RV."

The motion argued that defendant was prejudiced by Demergian's allegedly deficient performance. First, the motion argued prejudice was presumed because defendant "was left with no real defense" by virtue of Demergian's conflict of interest and total failure to interview witnesses. Second, the motion argued defendant was actually prejudiced because Demergian's alleged "failure to conduct any sort of investigation, interview witnesses, and call witnesses and present evidence" deprived defendant of the "meritorious defense" that "someone else was living in the RV, had access to the [P]roperty and was on the [P]roperty right before the police search."

21

Defendant supported his motion with declarations from five witnesses: Jack N., and the four defense witnesses who testified at trial (John, Keith, Frank, and Girlfriend).

Jack N. declared he had known defendant since defendant attended high school with Jack's son. Jack knew that defendant was the executor of his parents' estate until Brother "took over and . . . squandered" it. Jack contacted Brother to help divide the estate equally, but Brother stated "that he [i.e., Brother] was going to 'destroy [defendant]' and that he 'hates his [i.e., defendant's] guts.' " "[T]o the best of [Jack's] knowledge," defendant's parents had a gun collection that went missing after their deaths and while defendant did not have access to their homes. Finally, Jack vouched for defendant as a "very loyal" "hard worker" who "was getting his life together."

John stated in his declaration that (1) he met Brother in June 2022 "and saw him come and go from the Property often"; (2) Brother stayed in the RV on the Property; (3) he saw Brother coming and going from the Property on July 15 through 18, 2022, and had beers with him on July 17; and (4) he "did not see any water trailer on or around the Property."

Keith stated in his declaration that (1) he "saw [Brother] often doing work on the Property"; (2) Brother "was living in an RV on the Property"; (3) defendant, Girlfriend, and her children stopped by the Property on July 17, 2022, picked up a boat, and left; (4) Brother arrived at the Property sometime on July 17, looked like he had been drinking, and went into the RV; (5) Brother was still in the RV on July 18; and (6) he "did not see the water trailer on the Property at any time."

Frank stated in his declaration that (1) he knew defendant and Brother; (2) Brother stayed in the RV on the Property; (3) he had spoken to Brother "about his drinking problem and anger issues"; (4) he had seen

22

Brother use an excavator on the Property; (5) he saw Brother on the Property on July 15 through 18, 2022; (6) he "did not see any water trailer on or around the [P]roperty"; and (7) he saw defendant, Girlfriend, and her children leave the Property on July 17, 2022.

Finally, Girlfriend stated in her declaration that (1) Brother was living in an RV on the Property during the relevant time period; (2) she, her children, and defendant left the Property around noon on July 17, 2022 to go boating, during which time Brother "was coming and going on the Property"; (3) she "never saw a water trailer on the Property"; (4) Kelsie (defendant's former roommate) had access to the Property and the RV from around September 2021 to March 2022; (5) she returned a purse to Kelsie but "believe[d] it was left at the Property from when [Kelsie] was living there"; and (6) she "provided David Demergian with all of this information during trial, but he did not use it in [defendant]'s defense."

### (ii) The People's Opposition

The People opposed defendant's new trial motion. The People argued that Demergian "vigorously defended his client," the trial court "was able to observe [his] performance," and defendant was engaging in unseemly " 'Monday morning quarterbacking' " of Demergian's tactical decisions. The People observed that Demergian did, in fact, present numerous witnesses who advanced the third-party-culpability defense that implicated Brother. The opposition also challenged the credibility of defendant's declarants, raised evidentiary objections to Jack's declaration about defendant's parents' belongings, and posited that Jack's vouching for defendants' character opened the door to defendant's substantial criminal history.

23

### (iii)  The Trial Court's Ruling

The trial court heard defendant's new trial motion at the sentencing hearing.  The court stated it had reviewed "in quite detail" the parties' briefing, exhibits, the "trial file," and the judge's own "notes from the trial."  The parties submitted on their papers.  Demergian was present but no party called him as a witness.  The trial court denied the motion with a detailed ruling that consumes nearly 24 pages of the reporter's transcript.

On the threshold issue of the existence of a conflict of interest, the court found that, "assuming there had been a conflict of interest" arising from Demergian's representation of defendant and Brother in separate matters, the representation of Brother "ended with his death" about "eight months before the trial" in this case.[6]  The court noted Brother had not been charged in this case and that all of his other matters had resolved before he died.

Next, the court found that Demergian's prior representation of Brother "did not prevent [him] from presenting [a] third-party culpability" defense as to Brother.  To the contrary, the court explained, "That, in fact, was the defense that was presented at trial.  Defendant's trial counsel put on witnesses Frank H[.], John H[.], [Girlfriend], and Keith [M.], all of whom, in essence, testified to what they represent in their declarations filed as exhibits to support this motion . . . pertaining to third party, in other words, [Brother]'s culpability, as well as other alibi evidence."

As to the declarations, the trial court expressly found Girlfriend's to be "blatantly false" — "she claim[ed] she provided Mr. Demergian with all of the information in the declaration, but he did not use it at trial, despite the fact that she testified to all of the other points in her declaration at trial."  The

---

6    Based on Brother's death on August 21, 2023, and trial beginning in late May 2024, the relevant period is closer to nine months.

court also stated that "the only declaration for someone who did not testify at trial" — Jack N. — contained only irrelevant and speculative matter.

Regarding defendant's claim that Demergian should have hired an investigator to explore third-party culpability, the trial court concluded that the declarations from the trial witnesses were "fatal" to that challenge because they "all testified at trial to what they stated in their declarations" regarding third-party culpability.

The court also rejected defendant's claim that Demergian performed deficiently by failing to interview witnesses. First, the court noted that delaying witness interviews is "a questionable strategy . . . that old school defense attorneys have done to delay reciprocal discovery." Second, the court reasoned that, "in context," it was "clear [Demergian] was aware of the witnesses and obviously had some information as to the nature of the information they possessed since he listed all four of [the trial witnesses] in his witness list." "More importantly," the court noted, Demergian "did, in fact, interview the exculpatory witnesses in the days prior to their testimony." Consequently, the court found "there was absolutely no prejudice because, again, those witnesses actually testified at trial to what is in their declarations for this motion."

Regarding the failure to hire an investigator, the court noted that evidence about the circumstances of the thefts of the excavator and waterdog would have been immaterial because "defendant wasn't charged with *theft* of [either item], but rather with *receiving* or *concealing* stolen property." (Italics added.) As to an investigator identifying witnesses, the court found Demergian was not ineffective because the existing defense witnesses supported the alibi and third-party-culpability defenses. Thus, the court found no "prejudice from failing to" hire an investigator because "all those

25

witnesses testified" and "it wasn't trial counsel's not interviewing witnesses that resulted in the conviction here, *it was rather the jury not believing those witnesses*." (Italics added.)

The court found that defendant's other arguments were "either taken out of context or without evidentiary support." For example, the court explained that the relevant context for Demergian's supposedly belated request to inspect the excavator was his request for a special instruction regarding CHP's return of the excavator to its owner without prior notice to the defense. "In context," Demergian's request to inspect the excavator "was a challenge to the DA's assertion" — which proved false — "that CHP still had the excavator, and not a request to review it for evidentiary purposes." The court also found an inspection was unnecessary because there was no dispute about the excavator's value and there were many photos of the excavator.

The court also concluded that defendant took out of context Demergian's alleged admission that he "didn't hire a GPS expert" because it was "not relevant." The court explained that Demergian made this comment in the context of his motion in limine to prevent the prosecution from shifting its burden to the defense by arguing the defense could have produced exculpatory evidence of its own. Therefore, the court reasoned, "within context," Demergian's comment "was not that the GPS was not relevant, but rather his not hiring a GPS expert wasn't relevant, so that the People couldn't argue . . . 'defendant could have put on their own expert.' "

The court found defendant's GPS argument was further undermined because Demergian "clearly treated the GPS information as relevant" by moving to quash the search warrant and suppress the GPS evidence, moving

26

in limine to preclude testimony about it, and probing the evidence at an Evidence Code section 402 hearing.

In any event, the trial court found no prejudice arising from the GPS issue because "witness testimony and photographic evidence separately verified the accuracy of the locations for the water trailer as shown by the GPS."

Regarding the preliminary statement to Demergian's witness list that indicated he had not completed his investigation, the court found that the overall "context . . . was to leave open the door so that the defense can change disclosures, assert additional facts, and identify additional witnesses." The court found that "the totality of the circumstances clearly shows" Demergian was prepared for trial.

The court summarized its findings: "There was nothing in trial counsel's performance before this court that indicated in any way that he was not prepared or that his performance fell below prevailing professional standards. Each of the specific areas in which the defendant claims trial counsel provided ineffective assistance of counsel is either contrary to what actually occurred in the trial, [or] taken out of context so that what is asserted is inaccurate and/or was not prejudicial to the defendant."

Defendant's replacement counsel then argued Demergian performed deficiently for not investigating the case earlier (while Brother was still alive) and took issue "with the court's parsing of the preliminary statement in trial counsel's witness list." The trial court "reiterate[d] a couple of" points from its ruling. First, Demergian's "representation [of Brother] ended eight months before trial," which was "clearly enough time to adequately prepare." Second, "everything that [replacement counsel] assert[ed] the witnesses would have said at trial was said at trial. So, there is no prejudice there."

Finally, "when you compare [the preliminary statement of the witness list] to all of the work that defense counsel did and [the court's] observations of him during trial, it is clear that that was boilerplate language."

### 3. Analysis

Assuming without deciding that Demergian's concurrent representation of defendant in this case and Brother in other cases constituted a conflict of interest that lasted until Brother's death (see *Swartfager v. Wells* (1942) 53 Cal.App.2d 522, 527–528 [the attorney-client relationship generally ends at the client's death]), we conclude defendant has not met his burden to show either that Demergian's performance was deficient or that defendant suffered any prejudice.

Based on our independent review of the record, we see no evidence that Demergian's " ' "performance was 'adversely affected' " ' " by the assumed conflict or that he " ' " ' "pulled his punches" ' " ' " in litigating the case. (*Woodruff*, *supra*, 5 Cal.5th at p. 739.) To the contrary, the record shows Demergian actively litigated the case at every stage. At the preliminary hearing, Demergian successfully interposed evidentiary objections; questioned the accuracy of the GPS evidence; and established through cross-examination that it appeared someone lived in the RV on the Property, that it appeared that people stayed at the Property for days or weeks at a time, and that eyewitness and photographic evidence of the SUV break-in was inconclusive.

Next, Demergian filed numerous motions. He demurred to the information; moved to quash the search warrant and to suppress the fruits of the search; and moved in limine to exclude the GPS evidence, Steven and Kelsie's identification of defendant in photos, and evidence regarding the excavator.

During trial, Demergian surprised the prosecution with four last-minute witnesses. Demergian crafted his witness list to delay disclosure as long as possible. He had spoken to two of the witnesses informally long before trial and met with three of them (Frank, Keith, and Girlfriend) specifically to prepare them for trial days before they testified. These witnesses all testified that Brother lived on the Property, implicated him as the exclusive user of the stolen excavator, and provided an alibi for the waterdog theft and the theft of goods from Steven's SUV. Demergian also presented evidence of Brother's criminal history to render admissible Girlfriend's testimony that Brother possessed Steven's stolen gun. Girlfriend also claimed to own the gun found in defendant's bedroom, thereby providing a defense to the firearm-possession charge based on that gun.

In closing argument, Demergian addressed the People's burden of proof, the presumption of innocence, the reasonable doubt standard, and the evidence supporting the alibi and third-party-culpability defenses. As the prosecutor observed, Demergian's closing argument expressly "blam[ed] . . . the deceased brother, who can't testify for obvious reasons."

After trial, Demergian "made a very good argument" that convinced the trial court — "against [its] better judgment" — to allow defendant to remain at liberty while awaiting sentencing.

On this record, we see no evidence that Demergian pulled his punches.

On appeal, defendant faults Demergian for failing to hire a GPS expert. This challenge fails, however, because defendant has presented no evidence showing how a GPS expert could have helped his case. (See *People v. Bolin* (1998) 18 Cal.4th 297, 334 ["The record does not establish defense experts would have provided exculpatory evidence if called, and we decline to speculate in that regard as well."]; *People v. Datt* (2010) 185 Cal.App.4th

29

942, 953 ["Since defendant has failed to establish that his trial counsel failed to consult an expert or that such an expert would have been able to provide favorable testimony, he has not shown that his trial counsel was deficient in failing to present expert . . . testimony"].) Short of presenting a GPS defense expert, it appears Demergian did all he reasonably could to attack the prosecution's GPS evidence.

Defendant also argues that Demergian should have interviewed the defense witnesses sooner. But to what end? As it stood, the witnesses established defendant's alibi and third-party-culpability defenses. Indeed, the defense witnesses' trial testimony was substantially similar to the content of their declarations in support of replacement counsel's new trial motion. Further, had Demergian interviewed the witnesses sooner, he would have been required to disclose their statements to the prosecutor sooner, thereby enabling her to investigate and impeach their testimony. The trial court expressly recognized that delaying investigation is a trial tactic used by defense counsel of Demergian's vintage.

Accordingly, we conclude defendant has not met his burden to show Demergian performed deficiently. "Because [Demergian]'s performance was not deficient, we need not reach the second prong of the *Strickland* test, i.e., whether counsel's performance affected the outcome." (*Woodruff*, *supra*, 5 Cal.5th at p. 740.)

Even though we need not reach the issue, we further conclude that defendant has not shown that Demergian's allegedly deficient performance prejudiced defendant. Preliminarily, we reject defendant's assertion that prejudice is presumed because an actual conflict existed for a period of time. Although "a 'presumption of prejudice' may apply to certain kinds of attorney conflicts, including the active representation of competing interests, . . . even

30

then, the presumption does not apply until the defendant has demonstrated *adverse performance* related to the conflict." (*People v. Mai* (2013) 57 Cal.4th 986, 1038, fn. 20.) We have already concluded Demergian's performance was not adversely affected by his representation of Brother. Accordingly, we will not presume defendant was prejudiced.

On the merits, we conclude defendant suffered no prejudice. As the trial court observed, the evidence that defendant argues Demergian *should have* presented at trial is substantially the same as the evidence that Demergian *did* present at trial. Indeed, it was not Demergian's failure to interview witnesses sooner or to present witness testimony that adversely affected defendant's case; it was the jury's disbelief of defendant's witnesses. Therefore, defendant has not shown that he would have obtained a more favorable outcome at trial if Demergian had not once labored under a conflict of interest.

## B. The Trial Court Properly Designated Defendant's Four-year Sentence for Receiving a Stolen Vehicle as the Principal Term

All of defendant's current convictions would ordinarily be subject to a sentencing triad of 16 months, 2 years, or 3 years. (See §§ 496d, subd. (a), 1170, subd. (h)(1).) But based on his prior convictions for auto theft and receiving a stolen vehicle, defendant's current convictions for receiving a stolen vehicle were subject to "an alternate punishment scheme that prescribes an elevated sentencing triad" of 2 years, 3 years, or 4 years. (*People v. Lee* (2017) 16 Cal.App.5th 861, 869; see § 666.5, subd. (a).) The trial court sentenced defendant to the elevated four-year upper term on his conviction for receiving the stolen waterdog and the court designated that sentence the principal term. In a supplemental appellate brief, defendant

31

argues the trial court erred by doing so because "Proposition 57 added article 1, section 32[, subdivision] (a)(1)(A) to the California Constitution[,] which provides the 'full term for the primary offense means the longest term of imprisonment imposed by the court for any offense, *excluding the imposition of* an . . . *alternative sentence.*' " We disagree. The cited constitutional provision applies only to the determination of eligibility for parole consideration, not to the trial court's designation of the principal term at sentencing.

"Section 1170.1 provides the general formula for determining consecutive terms of imprisonment for persons convicted of two or more felonies." (*People v. Pelayo* (1999) 69 Cal.App.4th 115, 123; see *People v. Felix* (2000) 22 Cal.4th 651, 655.) Under this provision, the sentencing court must impose an "aggregate term of imprisonment" that is "the sum of the principal term, the subordinate term, and any additional term imposed for applicable enhancements for prior convictions." (§ 1170.1, subd. (a); see *Felix*, at p. 655.) The "principal term" is defined as "the greatest term of imprisonment imposed by the court for any of the crimes, including any term imposed for applicable specific enhancements." (§ 1170.1, subd. (a); see *Felix*, at p. 655 ["the term with the longest sentence is the 'principal term' "].) "[A]ny term consecutive to the principal term is a 'subordinate term.' " (*Felix*, at p. 655.) "The court imposes the full term . . . for the principal term" and, "in general . . . , imposes only 'one-third of the middle term' for subordinate terms." (*Ibid.*, quoting § 1170.1, subd. (a).)

In response to federal court orders requiring the California Department of Corrections and Rehabilitation to reduce prison population, the "Legislature and electorate subsequently enacted several measures aimed to reduce the prison population." (*In re Gadlin* (2020) 10 Cal.5th 915, 923.)

Against this backdrop, in "November 2016, the California electorate approved Proposition 57, the Public Safety and Rehabilitation Act of 2016" (*Gadlin*, at p. 919), which " 'increase[d] the number of inmates eligible for parole consideration" (*In re Kavanaugh* (2021) 61 Cal.App.5th 320, 349). "As relevant here, the initiative added section 32 to article I of the California Constitution. The new section states: 'Any person convicted of a nonviolent felony offense and sentenced to state prison shall be eligible for parole consideration after completing the full term for his or her primary offense.' " (*Gadlin*, at p. 923, quoting Cal. Const., art. I, § 32, subd. (a)(1).) The provision further states: "*For purposes of this section only*, the full term for the primary offense means the longest term of imprisonment imposed by the court for any offense, *excluding the imposition of an* enhancement, consecutive sentence, or *alternative sentence*." (Cal. Const., art. I, § 32, subd. (a)(1)(A), italics added.)

Seizing on the constitutional provision's exclusion of an "alternative sentence" from the determination of the "full term of the primary offense" (Cal. Const., art. I, § 32, subd. (a)(1)(A)), defendant argues the trial court erred by using section 666.5's alternative sentence as the basis for designating his elevated sentence on the conviction for receiving stolen property as the principal term. That is, defendant maintains the trial court should have determined the principal term without regard to section 666.5's elevated triad. This argument fails, however, because the invoked constitutional provision begins with the phrase, "*For purposes of this section only*." (Cal. Const., art. I, § 32, subd. (a)(1)(A), italics added.) This section relates to the determination of eligibility for parole consideration. The electorate's use of clear limiting language " 'belies any legislative intent to apply the definition[ ]' outside of the specified section." (*Make UC a Good*

*Neighbor v. Regents of University of California* (2024) 16 Cal.5th 43, 57, fn. 14, quoting *People v. Leal* (2004) 33 Cal.4th 999, 1007.) This intent is further evidenced by the fact that, whereas the cited constitutional provision expressly excludes "the imposition of an enhancement" (Cal. Const., art. I, § 32, subd. (a)(1)(A)) from determining the full term of the primary offense for parole eligibility purposes, section 1170.1, subdivision (a) expressly provides that "[t]he principal term . . . includ[es] any term imposed for applicable specific enhancements."

We therefore hold that article I, section 32 of the California Constitution does not preclude trial courts from using an alternative sentence mechanism when determining the principal term under section 1170.1.

## IV.  DISPOSITION

The judgment is affirmed.


RUBIN, J.


WE CONCUR:


DATO, Acting P. J.


CASTILLO, J.